IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| JOHN H. ROMBACH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-4121-CV-SW-NKL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court is Plaintiff John H. Rombach's ("Rombach") Social Security Complaint [Doc. # 3]. Rombach seeks judicial review of the Social Security Commissioner's ("Commissioner") denial of his request for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381, *et seq*. The Administrative Law Judge ("ALJ") found that Rombach was not entitled to benefits and such determination became the final decision of the Commissioner when the Appeals Council of the Social Security Administration ("Appeals Council") denied Rombach's request for review. Rombach has exhausted his administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g). Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Rombach's Petition.

**I.      Background**

## A. Factual and Procedural History[1]

Born on September 21, 1962, Rombach, who has an eleventh-grade education, had been employed as a pipe insulator. Rombach protectively filed an application for disability insurance and supplemental security income benefits on June 4, 2007, which was initially denied. He reapplied on September 27, 2007, claiming on his application for disability insurance that he became disabled on August 3, 2007, due to "Aneurysm in Right Leg." [Tr. 149]. He asserted a disability onset date of June 4, 2007, on his supplemental security income application, which was later corrected to August 3, 2007. Following an evidentiary hearing on June 10, 2009, the ALJ issued a written decision denying disability benefits to Rombach because he was not under a "disability" as defined in the Act. [Tr. 14]. After the Appeals Council denied Rombach's request for additional administrative review of the ALJ's decision, Rombach sought review by the Court.

Rombach weighed about 240 pounds at the time of the hearing. Rombach testified that due to the pain in his leg caused by the aneurism in his right leg, he could not work. He testified that the pain "just gets worse every day." [Tr. 23]. Rombach worked until his alleged disability onset date of August 2007, and then worked reduced hours until he was laid off in August 2008. [Tr. 23-24, 143]. Rombach also testified that he received unemployment insurance benefits, and acknowledged that as a condition of receiving

---

[1] The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

benefits, he stated that he was "ready, willing, and able to work." [Tr. 21]. At the hearing, Rombach admitted: "To a certain extent I can [work]." [Tr. 22].

Rombach's right leg aneurism occurred in December 2006. He underwent a thrombolysis and a vein bypass graft. Upon discharge, he was advised to gradually resume his normal activities. On January 2, 2007, Rombach followed up with Dr. Kirt Nichols, M.D., at the Vascular Surgery Clinic. Dr. Nichols noted that Rombach was "generally doing well." [Tr. 218]. He recommended compression to help control Rombach's significant leg swelling. On January 7, 2007, Rombach was admitted to the University of Missouri Health Care (UMHC) and treated by Teresa Kroeker, M.D. Rombach complained of pain with walking and increased serious drainage from the incision. Dr. Kroeker ordered the wound drained and prescribed antibiotics and pain medication. Five days later, Dr. Kroeker discharged Rombach and noted that he was "ambulating well," and his pain "was controlled" with medication. [Tr. 220].

On March 29, 2007, Rombach saw Modesta Tako, M.D., at the Family Health Center (FHC), for swelling and pain in his right leg. Dr. Tako noted that it had been almost three years since Rombach was last seen at FHC and it had been several months since his hypertension was treated. Rombach appeared to be in discomfort and reported keeping his right leg elevated at home. He reported that he was a plumbing-pipe installer, which required him "to be on his feet 8-10 hours a day," and attributed pain and swelling in his leg to the demands of work. [Tr. 248]. Rombach did not have insurance. Dr. Tako

3

strongly encouraged Rombach to quit smoking and prescribed blood pressure medication. Dr. Tako "thought about doing an arterial venous ultrasound" on Rombach's leg, however, Rombach indicated that the swelling was "pretty much the same" and that he was primarily concerned with the pain. [Tr. 248]. On April 12, 2007, Dr. Tako wrote that Rombach limped and had an ace bandage over his right leg to keep the swelling down. Dr. Tako diagnosed Rombach with peripheral artery disease, chronic pain secondary to peripheral artery disease, and uncontrolled high blood pressure. She prescribed Vicodin.

On May 2, 2007, Rombach returned to FHC for a follow-up appointment. He complained that "total pain control was not achieved." [Tr. 246]. Dr. Tako noted that the "right leg does not appear swollen" and "is only very mildly discolored and feels warm to palpation." [Tr. 246]. Dr. Tako changed pain medication "in the hope of getting more pain control" and encouraged Rombach to walk to help improve circulation in his lower legs. [Tr. 246].

On May 21, 2007, Rombach again saw Dr. Tako regarding leg pain. He stated that his job was "very physical, making it necessary for him to take more pain medication than is prescribed." [Tr. 245]. Dr. Tako refilled Rombach's Percocet prescription, and advised him he would not get any more early refills and that he should take Percocet only at bedtime or on the weekends. Dr. Tako also noted that Rombach missed his last appointment and the fasting laboratory panel that she previously ordered. Dr. Tako wrote that Rombach was at risk for coronary artery disease and also prescribed Lisinopril.

4

On June 18, 2007, Rombach saw Dr. Tako for right lower leg pain. Dr. Tako noted that Rombach did not use any assistive walking devices and hypertension was improving with treatment. Dr. Tako switched Rombach to Oxycodone because Percocet apparently did not control Rombach's pain. Dr. Tako again advised Rombach to only take his medication at night and on the weekends, but noted: "It does not seem he is doing it that way, because he still runs out of his prescriptions early." [Tr. 244]. Dr. Tako also noted: "He has applied for disability, and is hoping that he will qualify so he does not have to do this kind of work anymore." [Tr. 244].

Rombach continued to visit the FHC for treatment, but on July 20, 2007, his care was transferred from Dr. Tako to Andrew Quint, M.D. Rombach stated that he had marginal pain control and that the pain was not exertionally related and was worse at night. Dr. Quint diagnosed chronic foot, leg, and ankle pain, most likely neuropathic secondary to ischemic nerve damage, and noted that Rombach had ongoing difficulties with neuropathic type pain in the foot and ankle. Because of the neuropathic origin of the pain, Dr. Quint also prescribed gabapentin for pain control.

On August 14, 2007, Rombach visited the UMHC emergency room due to constant moderate right foot pain. Neurological examination revealed lower extremity burning to the lateral aspect. The doctor "suspect[ed] vascular insufficiency." [Tr. 183]. Ultrasound results were normal.

On August 17, 2007, Rombach again saw Dr. Quint, who noted that Rombach was taking around eight Oxycodone a day depending on his leg pain and that his pain was

"reasonable" when on the medication. [Tr. 242]. Rombach admitted that he never tried gabapentin because he believed it was an antidepressant. After Dr. Quint explained what gabapentin was and how it worked, Rombach agreed to try it.

On September 17, 2007, Rombach returned to FHC to see Dr. Quint. Rombach said he ran out of blood pressure medication and had taken the gabapentin (also called Neurontin) only occasionally. Dr. Quint again explained the benefits of taking Neurontin, and Rombach stated that he would start taking it. Dr. Quint also ordered laboratory work.

Rombach saw Dr. Quint two months later on December 17, 2007, and informed Dr. Quint that he had stopped taking Neurontin because it made him "feel funny" and he did not think it was helping. [Tr. 264]. Because Rombach did not get the fasting laboratory panel that was ordered in September, the lab work was reordered. On January 9, 2008, Rombach had blood drawn for the lab work. However, several results from the panel were void because Rombach failed to fast. [Tr. 288-89].

On January 16, 2008, Rombach reported to Dr. Quint that as long as he took pain medication the "relief was really pretty good" and "most of the time he did not really notice the pain." [Tr. 265]. However, Rombach added that he sometimes got brief sharp pain at night. To address his chronic pain, Dr. Quint prescribed Lyrica and "explained to [Rombach] again the role of Lyrica in chronic pain and neuropathy versus oxycodone." [Tr. 266]. Dr. Quint refilled Rombach's oxycodone prescription to last until February 15, 2008. On the date of the visit, Rombach weighed over 260 pounds. The doctor discussed diet and exercise at length with Rombach and encouraged at least thirty minutes a day of

6

"rigorous exercise." [Tr. 265]. Dr. Quint noted that Rombach's blood pressure was elevated because he had not been taking the hydrochlorothiazide previously prescribed for him. Dr. Quint also prescribed Gemfibrozil to address Rombach's hyperlipidemia.

On February 13, 2008, Rombach reported exercising regularly and consistently taking his blood pressure medication and Lyrica. He continued to take eight Oxycodone a day for pain control. One month later, Rombach reported that his pain was not improving with Lyrica. Dr. Quint told him to continue taking Lyrica "for at least 3 months, and if he feels after 3 months that it really has not made any difference in his symptoms, then he can stop it at that point." [Tr. 268]. The doctor asked Rombach to return in one month.

Rombach next returned to the FHC six months later on October 13, 2008, when he saw Denise Barba, M.D., to obtain pain medication refills. He informed Dr. Barba that he was out of his medications "2 to 3 days" before the appointment. Rombach reported that he continued to have right calf pain along with foot aches and numbness of his right calf, and that he now experienced the same pain on his left leg with exertion. His right calf had lost sensation compared to the left. Rombach was diagnosed with chronic leg pain secondary to ischemic neuropathy and hypertension.

On November 2, 2008, Rombach visited the UMHC emergency room for various complaints including left leg pain. A physical examination showed that Rombach's legs were "within normal limits." [Tr. 306].

Rombach continued to see Dr. Barba to refill his pain medications and for follow-up care. On November 5, 2008, Rombach reported to Dr. Barba that his pain was under "reasonably good control" and his pain medications were continued. [Tr. 272]. On November 25, 2008, he reported that he "has been working a little bit more today and so the pain has increased a bit but still under control." [Tr. 273].

On January 12, 2009, Rombach was seen by Dr. Barba for hypertension and back pain that radiated to his right thigh. On February 13, 2009, Rombach again saw Dr. Barba. Although swelling was noted, Rombach reported that his right leg pain was "stable" and relieved and controlled by pain medication. [Tr. 277]. Rombach also reported that although he took his blood pressure medication consistently, he was not compliant with exercise or dietary orders. Dr. Barba observed that Rombach's hypertension was worsening and uncontrolled. Dr. Barba's notes described Rombach's employment status as "laid off." [Tr. 278].

On March 1, 2009, Rombach was admitted to the UMHC emergency room with complaints of chest pain and pressure consistent with unstable angina. Hypertension control was "poor." [Tr. 297]. A physical examination showed no cyanosis or edema in his legs. On March 3, 2009, a catherization indicated a right coronary artery lesion and 85 percent blockage, requiring stenting, which was deemed "successful." [Tr. 299-302]. The physician advised Rombach to walk and climb stairs as tolerated and to return to the Cardiology Clinic in one month. The doctor prescribed anticoagulation medication and Plavix. Rombach was released on March 3, 2009.

8

On March 5, 2009, Rombach saw Dr. Barba and described his leg pain as "stable." [Tr. 281]. No complications or worsening symptoms were reported related to the stent or right leg. In addition, the physical examination showed regular cardiovascular rhythm with no murmurs, gallops, or rubs. [Tr. 283]. Dr. Barba recommended that he return to FHC within one month and also follow up with his cardiologist.

On April 6, 2009, Rombach returned to Dr. Barba for follow-up care. He complained that his leg ached and was aggravated by movement and walking. He also stated he had "recently started working." [Tr. 284]. Dr. Barba continued to prescribe Oxycodone and Oxycontin to control pain.

In an undated letter, received by Rombach's attorney on June 4, 2009, Dr. Barba stated that Rombach has a "history of chronic lower extremity pain secondary to chronic peripheral arterial disease" and has had a "R femoral artery thrombus," which needed a bypass graft in 2006. [Tr. 323]. Dr. Barba also noted that Rombach underwent angioplasty in March 2009 and recently suffered from a myocardial infarction. Due to Rombach's conditions and need for narcotic medication to control chronic pain and frequent elevation of his legs to control swelling, Dr. Barba opined that Rombach was prevented from working gainfully on a full-time basis. [Tr. 323].

Rombach testified that as of the date of the hearing, his physicians have not found additional aneurisms since that time. Rombach also stated that his left leg now bothered him, likely because he uses it a lot more to avoid using his right leg. [Tr. 32]. Rombach testified that his right leg feels "like a stiff two by four" [Tr. 32] and that his entire leg

hurts, including the hip area.  According to Rombach, his leg would get stiff and sore after five to ten minutes of standing or sitting.  Associated swelling "never goes away." [Tr. 33].  Rombach testified that the pain in his leg limits him to walking, standing, or sitting around five to ten minutes at the most at a time.  Rombach asserted the most weight he could occasionally pick up is twenty to thirty pounds.

To treat some of his symptoms, Rombach testified that he takes 40 milligrams of OxyContin twice a day and a "a couple" of oxycodone in between those dosages.  The drugs sometimes made him drowsy.  At the hearing, he testified that the dosage wasn't really working any more.  Rombach also testified that he elevates his leg "all the time" on advice from his doctors and that he also placed a heating pad on his leg.  [Tr. 33]. Rombach stated that he would elevate his leg above the heart for an hour at various times during the day and sleep with it elevated through the night.  Rombach also testified that after having a heart stent put in, he had difficulty with controlling his blood pressure and breathing.  He indicated that he was still having "slight" chest pains, which "comes and goes," mostly when he lies down or is relaxing.  [Tr. 34-35].

Rombach testified that he lost some weight since February 2009 and quit smoking. Rombach lives with his girlfriend, who currently attends school.  Rombach testified that when she is out of the house, he cooks for himself and helps around the house including picking things up.  He also testified that he drives and shops for necessities.

### B. The ALJ's Decision

To establish his entitlement to benefits, Rombach must be unable to engage in any substantial gainful activity by reason of a medically determinable impairment or combination of impairments which could be expected to end in death or to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d) (2006). For the purposes of the Act, Rombach was not under a "disability" unless his impairment was so severe that he was unable to do his previous work or any other kind of substantial gainful work which existed in the national economy. *Id.* The ALJ found that Rombach did not meet this burden since Rombach's alleged disability onset date of August 3, 2007. [Tr. 14].

The ALJ found that Rombach had the following severe impairments: coronary artery disease, hypertension, and a history of a right leg aneurysm that is status post vein graft. [Tr. 9]. *See* 20 C.F.R. 404.1520(c) and 416.920(c). However, the ALJ determined that Rombach did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. pt. 404, subpt. P, app. 1 (2008). The ALJ further found that Rombach retained the residual functional capacity ("RFC") to perform work with the following limitations:

> lift 20 pounds occasionally and 10 pounds frequently, stand or walk six hours out of an eight-hour work day, and sit six hours out of an eight-hour work day. The claimant cannot climb ropes, scaffolds, or ladders, and he is limited to no more than occasional pushing or pulling with his lower extremities, climbing ramps or stairs, or crouching or crawling. The claimant must avoid concentrated exposure to extreme heat or cold, excessive vibration, unprotected heights and industrial hazards.

[Tr. 10].

Although the ALJ found that Rombach could not perform past relevant work, he did find that Rombach could perform the jobs of electronic assembler and cleaner. The ALJ found that there are a significant number of these jobs in the national economy, 5,675 of which are in Missouri. [Tr. 14].

Rombach raises two arguments on appeal. He asserts that the ALJ's decision is not supported by substantial evidence because the ALJ: 1) failed to correctly assess Rombach's RFC because he did not give proper weight to the opinion of Rombach's treating doctor, Dr. Denise Barba, 2) improperly analyzed Rombach's credibility. [Doc. # 15, at 8-13].

## II.  Discussion

In reviewing the Commissioner's denial of benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

### A.  Consideration of Dr. Barba's Opinion

Dr. Denise Barba has been Rombach's primary care physician since October 2008. According to Rombach, the ALJ failed to properly accord substantial weight to the opinion expressed by Dr. Barba in her undated letter, which was received by Rombach's attorney on June 4, 2009. [Doc. # 18, at 19].

In his written opinion, the ALJ specifically discussed Dr. Barba's undated letter and concluded that a number of reasons rendered her opinion "less persuasive." [Tr. 12]. The Court finds that the ALJ appropriately considered Dr. Barba's opinion. First, opinions regarding whether an individual can be gainfully employed are "not medical opinions but opinions on the application of the [Social Security] statute." *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991). Such an opinion from a treating source is never entitled to controlling weight, as noted by the ALJ. *See* SSR 96-5p.

Second, the ALJ properly observed that Dr. Barba merely recounted Rombach's past diagnoses and conditions, but failed to include any specific discussion of restricted activities or exertional limitations that would support her conclusion that Rombach was unable to work. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (a treating physician's opinion is not conclusive and must be supported by medically acceptable clinical or diagnostic data); *Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006) (ALJ permitted to disregard a physician's conclusory statement unsupported by medical evidence). Dr. Barba provided little context as to how she divined Rombach's functional capacity and hence inability to do even light or sedentary work from a mere re-listing of his diagnoses. True, Dr. Barba noted that Rombach was required to "frequent[ly] lift his

leg" to reduce swelling. However, she did not elaborate as to how high, how long, when, or under what circumstances Rombach was to elevate his leg, nor is such an explanation provided in her treatment notes.

Third, as the ALJ noted, Dr. Barba's opinion "contrasted sharply" with the other medical evidence in the record, including her own treatment notes. For example, Rombach consistently reported to Dr. Barba that his right leg pain was "controlled," "under good control," "stable," "under reasonably good control," and "relieved" with prescription medication. [Tr. 269, 272, 277, 279, 281, 284]. Rombach had similarly reported to Dr. Andrew Quint in early 2008 that "during the day his pain relief is really pretty good" and that "most of the time he does not really notice the pain" when he takes oxycodone. [Tr. 265]. An impairment that can be controlled by treatment or medication is not considered disabling. *See Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) (quoting *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002)). Furthermore, when Rombach informed Dr. Barba that he had returned to work, she did not advise him of any work restrictions or exertional limitations, and there was no indication that Rombach should elevate his leg. [Tr. 269-87]. *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability). Dr. Tako also did not similarly provide exertional work restrictions other than to avoid operating heavy machinery and climbing ladders when taking certain medications. [Tr. 245]. Indeed, Dr. Quint had encouraged Rombach to

14

engage in rigorous exercise. [Tr. 265]. As these examples indicate, the record contains much evidence that contrasts with Dr. Barba's opinion.

Fourth, the Court notes that it is unclear what the ALJ considers to be only a "brief" treatment history, which was the ALJ's characterization of the relationship between Rombach and Dr. Barba. The record shows that Dr. Barba saw Rombach seven times between October 2008 and April 2009. However, the Court acknowledges that Dr. Barba's treatment relationship with Rombach was due to a narcotic-medication contract and that his visits were primarily to obtain refills for his pain medications as opposed to seeking alternative treatment.

Rombach asserts that the ALJ erred by failing to contact Dr. Barba for "clarification as to her medical opinion." [Doc. # 15, at 11-12]. An ALJ is required to re-contact a treating physician only if the medical records provided by a plaintiff are inadequate to determine whether he is disabled or if clarification of a conflict or ambiguity in the treating physician's report is necessary or a crucial issue is undeveloped. *See* 20 C.F.R. §§ 404.1512(e) and 416.912(e); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005); *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994). Rombach fails to identify for the Court any inadequacies in the medical record, Dr. Barba's report, or any crucial issue that is undeveloped. Without more, the Court cannot find that the ALJ was compelled to seek clarification from Dr. Barba simply because her opinion contrasted with other evidence in the record. *See, e.g.*, *Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005) ("[T]he ALJ discounted the opinions because they were inconsistent with other

15

substantial evidence. In such cases, an ALJ may discount an opinion without seeking clarification.").

For the foregoing reasons, although Dr. Barba is a treating physician of Rombach's who had seen him seven times since October 2008, her medical opinion was appropriately discounted by the ALJ.

### B. Assessment of Rombach's Credibility

Rombach argues the ALJ erred in considering his testimony regarding his application for unemployment insurance and erred in discounting Rombach's credibility for his noncompliance with treatment. Credibility questions concerning Rombach's subjective testimony are "primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003). The Eighth Circuit requires that the ALJ discuss a plaintiff's testimony "in light of the five *Polaski* factors"–(1) the claimant's daily activities; (2) duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions–and to "expressly set forth" any inconsistencies. *Douthit v. Bowen*, 821 F.2d 508, 509 (8th Cir. 1987); *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

Here, the ALJ specifically referred to Rombach's several applications for unemployment benefits and noted:

> A person who, as the claimant has, presents himself to the State of Missouri as ready, willing, and able to work during a period of alleged disability in order to receive unemployment benefits raises issues of the overall

> credibility of his disability application because in it he also alleges an inability to work because of a combination of impairments.

[Tr. 12]. *See Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) ("This Court has noted that "[a] claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work.").

Rombach argues that the ALJ improperly discounted his credibility based upon his unemployment-insurance application because "POMS Section SI 00510.001 'Overview of the Filing for Other Programs Benefits Requirement' states that a claimant is not eligible for SSI if he is advised he is potentially eligible for other benefits." [Doc. # 15, at 13]. By this argument, Rombach appears to represent that he was required to apply for unemployment benefits and therefore his statements that he was "ready, willing and able to work" should not be weighed against his credibility. However, POMS § SI 00510.001 does not require a claimant to file for unemployment benefits if he is disabled. Indeed, POMS § SI 00510.001 merely alerts a potential SSI claimant that if he is "potentially eligible" for other benefits, he may not be eligible for SSI benefits. Here, if Rombach were disabled, as he claims, he would not be eligible for unemployment benefits. As the ALJ noted at the hearing, Rombach "can't have it both ways." [Tr. 22].

Additionally, when discussing Rombach's representation to the State of Missouri in his unemployment applications that he was "ready, willing, and able" to work, the ALJ noted that Rombach testified that he could work "to a certain extent." [Tr. 12]. Indeed, Rombach testified that he worked reduced hours from August 2007, his alleged onset date

17

of disability, through August 2008. [Tr. 24]. Moreover, the medical record shows that Rombach worked in October 2008, November 2008, and April 2009. [Tr. 271, 273, 284]. Thus, it was not unreasonable for the ALJ to consider the representations made by Rombach in his application for unemployment benefits as those representations are bolstered by Rombach's testimony and his statements to his treatment providers.

Rombach also argues that the ALJ improperly discounted his credibility based upon his noncompliance with treatment. [Doc. # 13, at 12]. Specifically, Rombach argues the ALJ "undermine[d] the Plaintiff's credibility by stating that the Plaintiff was not compliant with his medications and had been out of his medications for two to three days at one appointment." *Id.* The ALJ specifically noted that Rombach was "prescribed Gabapentin for his neuropathy, but he did not take this medication." [Tr. 11]. The ALJ also noted that Rombach did not take other medication which were prescribed for him: Neurontin for his leg pain, and metoprolol and hydrochlorothiazide for his hypertension. [Tr. 11]. The ALJ also noted that Rombach was not compliant with fasting labs ordered by one of his physicians.

Rombach appears to assert that while "[a] failure to follow a recommended course of treatment also weighs against a claimant's credibility," *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005), he had valid reasons for his deviations. *See* SSR 96-7p. For example, he was not insured and had to apply to get his medication through a patient assistance program; he ran out of pain medication prior to an appointment because he needed to take extra dosages during a period of increased pain; and his doctors changed

his prescribed medications depending on what worked most effectively for him. [Doc. # 15, at 12-13]. However, Rombach does not identify to the Court why these "reasons" prevented him from following his prescribed course of treatment. For example, Rombach does not inform the Court, nor does the record show, why Rombach's need to obtain medication through a patient assistance program prevented him from complying with taking the required medications prescribed by his physicians. Nor does Rombach explain why such reasons prevented him from obtaining lab work when ordered or from properly fasting prior to having his blood drawn. Therefore, the ALJ appropriately took into consideration Rombach's noncompliance with his prescribed course of treatment when assessing his credibility.

For the foregoing reasons, the Court finds that the ALJ properly considered evidence relevant to assessing Rombach's credibility.

### C. Assessment of Rombach's RFC

The Court has found that the ALJ properly assessed Dr. Barba's opinion and Rombach's credibility. *See* Part II.A-B. Thus, the Court finds that there are no deficiencies with the ALJ's determination of Rombach's RFC. Because the ALJ presented a hypothetical to the vocational expert consistent with this RFC, the vocational expert's testimony stating that Rombach could perform work existing in significant numbers was substantial evidence in support of the ALJ's determination. *See Miller v. Shalala*, 8 F.3d 611, 613-14 (8th Cir. 1993) ("The VE's testimony amounts to substantial

evidence if the question asked precisely stated the impairments that the ALJ accepted as true.").

## III. Conclusion

Accordingly, it is hereby ORDERED that John H. Rombach's Petition [Doc. # 3] is DENIED.

                                                    s/ Nanette K. Laughrey
                                                  NANETTE K. LAUGHREY
                                                  United States District Judge

Dated: May 16, 2011
Jefferson City, Missouri